UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | Cause No. 1:11-cr-184-WTL-KPF |
| JOSEPH JOHNSON, | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION TO**
**SUPPRESS AND MOTION FOR A *FRANKS* HEARING**

This cause is before the Court on the Defendant Joseph Johnson's motion to suppress (dkt. no. 36) and motion for a *Franks* hearing (dkt. no. 43). The Court held a hearing on the matter on October 15, 2012. The Court, being now duly advised, rules as follows.

## I. BACKGROUND

On June 15, 2011, the Defendant, Joseph Johnson, was walking along a street in Indianapolis when he was stopped by an Indianapolis Metropolitan police officer. The officer ordered Johnson and his companion to put their hands on the police vehicle. Before Johnson did so, he is alleged to have removed a gun from his pants and tossed it into some tall grass near the roadway. Johnson was subsequently arrested and charged with the offense of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

Johnson filed a motion to suppress the handgun as the product an illegal seizure under the Fourth Amendment. In addition, following the issuance and execution of a warrant to obtain a DNA sample from Johnson, Johnson filed a motion for a *Franks* hearing, challenging the affidavit supporting that warrant.

## II. DISCUSSION

Pursuant to Federal Rule of Criminal Procedure 12(d), the Court first sets forth its factual findings before addressing its conclusions of law.

### A. Findings of Fact

On May 27, 2011, IMPD Officer Dennis Wilkes began surveillance of a parking lot on the eastside of Indianapolis, Indiana, as part of an undercover drug buy. This buy was part of a larger "Drug Market Initiative," whereby undercover officers would purchase drugs from drug dealers. After the dealers left the buy location, they would be stopped by patrolling, uniformed officers and asked for identification. The dealers would not be arrested at that time so as to preserve the identity of the undercover agents; rather, the dealers' names would be retained and they would be charged later when that particular phase of undercover buys had ended.

On this particular day, Officer Wilkes visually and auditorily observed undercover agents purchase drugs from a "target" dealer. Once the deal was complete, the description of the target was broadcast by radio transmission to patrolling, uniformed officers, who stopped the target and identified him. That target was the Defendant, Joseph Johnson. Pursuant to protocol, Johnson was not arrested at that time.

Several days later on June 15, 2011, Officer Wilkes was again surveilling a parking lot in which undercover drug buys were to take place. Undercover agents sitting in a vehicle were approached by two individuals and the conversation eventually turned to buying a "twenty" (drugs). The agents were advised to pull across the street while the individuals obtained the drugs from a nearby residence. The agents did as they were instructed; Agent Wilkes maintained visual surveillance.

The two individuals then approached the vehicle and made the transaction. From his vantage point, Agent Wilkes was unable to determine which individual physically transferred the drugs, but he testified that he believed the two men were "together," in that one of them was a dealer and the other was a companion.

Once the deal had been completed, Agent Wilkes radioed a description of the two individuals and their direction of travel to patrolling officers and requested a stop and identification. At the hearing, Agent Wilkes testified that he described the individuals as two black males and included a description of their clothing, although he was now unable to remember that description in any detail.

IMPD Officer Bryan Sosbe was patrolling in the area in a marked police car and heard the transmission, which he characterized as a "narcotics" transmission. He drove to the area described by Officer Wilkes. IMPD Office Frank Wooten was also patrolling in the area in a marked police car and also heard the transmission. He too headed in the direction the men were traveling.

Between 45 seconds and one minute after the radio transmission, Officer Sosbe came upon two men walking side-by-side in the street in the general area identified by Officer Wilkes, although their direction of travel did not closely match that described by Officer Wilkes. Officer Sosbe pulled his car up to the two men so that his front bumper came even with them; he then stopped his car and turned his spotlight on the two men. The men, who were now on the passenger side of the police cruiser, stopped and looked at the officer.

At this time, Officer Wooten had pulled up behind and to the right of Officer Sosbe's car. As Officer Sosbe exited his vehicle, he told the men to place their hands on the fender of his vehicle. The man standing closest to the police cruiser immediately put his hands on the front

3

fender. However, Officer Sosbe observed the other man first "mess" with his shirt – he appeared to untuck his shirt and then pull on it – but Officer Sosbe could not see clearly what he did because the other individual was standing between them. The man then put his hands on the vehicle.

Officer Wooten, however, saw more clearly what occurred. He too saw this individual reach into his side rear pants area, but he further saw that the individual threw something in the grass. The man then pulled on his shirt as if to straighten it. After Officer Wooten saw the man discard the object, he walked straight from his vehicle to the area where he believed the object had landed. There, he saw a handgun lying on top of the grass. Officer Wooten testified at the hearing that he had no doubt that the handgun he saw in the grass was the object he had just observed being thrown by one of the men. In the interest of officer safety, Officer Wooten then directed that both men be handcuffed. Officer Wooten testified that the man who had immediately placed his hands on the vehicle was not arrested and was eventually released. The man who had thrown the gun was arrested. That man is Defendant Joseph Johnson.

### B. Conclusions of Law

#### 1. *Motion to Suppress*

Johnson argues that Officer Sosbe's stop runs afoul of the Fourth Amendment, and therefore all evidence discovered following that stop must be suppressed.[1]

In response, the Government argues that Officer Sosbe's stop of the two men is a permissible *Terry* stop. *Terry v. Ohio*, 392 U.S. 1 (1968). To justify a stop under *Terry*, the officer

---

[1] The Government urges that Johnson does not have standing to challenge the stop because, at least at one time, Johnson asserted that it was his companion who possessed, and later discarded, the gun. However, a defendant is not derived of standing under the Fourth Amendment simply because he claims innocence of the charged offense. *See Gardner v. United States*, 680 F.3d 1006, 1011 (7th Cir. 2012).

must have specific and articulable facts, which, taken together with the rational inferences drawn from them, reasonably warrant the intrusion on the individual's privacy. *See, e.g., United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). In other words, the officer must have an articulable, reasonable suspicion that criminal activity has, is, or is about to occur. *See id.* In such cases, the government bears the burden of proving by a preponderance of the evidence that the stop meets these criteria.

In evaluating a purported *Terry* stop, the Court assesses (1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts. *United States v. Duguay*, 93 F.3d 346, 350 (7th Cir. 1996). A police officer effecting a *Terry* stop "need not be personally aware of all of the 'specific and articulable' facts justifying the intrusion." *United States v. Nafzger*, 974 F.2d 906, 910 (7th Cir. 1992). Rather, under the collective knowledge doctrine, the stopping officer may rely on another officer's reasonable suspicions when (1) the officer effecting the stop acts in objective reliance on the information received; (2) the officer providing the information had a reasonable suspicion to justify the stop; (3) the stop conducted was no more intrusive than would have been permissible for the officer requesting it; and (4) the requesting officer's belief that there was sufficient evidence to detain a suspect was communicated to the officer performing the stop. *Id.* at 911. The stopping officer need not know the supporting facts; rather, he is entitled to rely on the conclusion relayed to him by another officer. *Id.* at 913. Furthermore, "when officers are in communication with each other while working together at a scene, their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed." *Id.* at 911.

Here, the Court finds that the Government has established by a preponderance of the evidence that Officer Wilkes had reasonable suspicion sufficient to justify a *Terry* stop, and that reasonable suspicion was communicated to Officer Sosbe, who relied on it. Furthermore, the stop effected by Officer Sosbe was no more intrusive than that permitted of Officer Wilkes. Specifically, Officer Wilkes testified that he observed two males participate in an undercover drug buy; he then radioed a request for a stop and identification of the men and included a description of their clothing and their direction of travel. Officer Sosbe testified that he heard the transmission and proceeded to the area, where he saw men fitting Officer Wilkes' description. He then stopped the two men and sought identification; in the interim, Johnson threw the gun into the grass. Officer Sosbe permissibly relied on Officer Wilkes' reasonable suspicions and acted on those suspicions within the limits established by the Fourth Amendment.[2] Accordingly, there has been no Fourth Amendment violation, and Johnson is not entitled to suppression of the handgun evidence.

## 2. *Motion for a* Franks *Hearing*

Johnson has also moved for a *Franks* hearing, an evidentiary hearing wherein a defendant challenges the propriety of a search warrant by challenging its underlying affidavit. To obtain such a *Franks* hearing, a defendant must first make a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and the allegedly false statement was necessary to a finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). If the defendant makes such a showing, he is then entitled to a hearing, at which he must show, by a preponderance of the

---

[2] Office Sosbe testified that he also looked for an "independent" legal reason to the stop the men, in an abundance of caution. He testified that the men were walking in the street when a sidewalk was available, which he testified violated the Indiana traffic code, although he could not remember the specific code section.

evidence, that the warrant affidavit contained perjury or a reckless disregard for the truth. *Id.* If the defendant meets his burden, the Court must set aside the tainted material, review the remaining portions of the affidavit, and determine whether the remaining affidavit supports probable cause. *Id.*

In this case, the Government obtained a search warrant to take a DNA sample from Johnson and supported its warrant application with an affidavit from Officer Ron Gray of the Bureau of Alcohol, Tobacco, Firearms, and Explosives Achilles Task Force. Johnson argues that Officer Gray omitted material facts rendering the remaining affidavit false and misleading; specifically, he argues that the omission of a description of the grass near the sidewalk (tall and overgrown), as well as omission of the sequence of the handcuffing of the men and subsequent release of Flemming, renders the affidavit false in material respects.

Johnson has not made the requisite substantial preliminary showing. Even assuming the omitted information were material and rendered the affidavit false, Johnson has not produced any evidence to suggest that the affiant acted intentionally, knowingly, or with reckless disregard for the truth. *See United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000) ("The defendant must offer evidence showing either that the warrant affiant lied or that the warrant affiant recklessly disregarded the truth because he in fact entertained serious doubts as to the truth of his allegations or had obvious reasons to doubt the veracity of the allegations." (quotations omitted)). As a result, Johnson is not entitled to a *Franks* evidentiary hearing, and his motion must be denied.

### III. CONCLUSION

For the foregoing reasons, the Defendant's motion to suppress is DENIED. The Defendant's motion for a *Franks* hearing is DENIED.

SO ORDERED: 10/23/2012

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.